■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NAQEEBULLAH SHAIRZAI, Appellant. [627 NYS2d 347] —Judgment, Supreme Court, New York County (Alfred Kleiman, J.), rendered October 2, 1992, convicting defendant, after a trial by jury, of arson in the second degree and sentencing him to a term of imprisonment of 4 to 12 years, unanimously reversed, on the law, and the matter remanded for a new trial.

In the early morning hours of October 16, 1990, a fire was found to have been deliberately set in a take-out fried chicken restaurant of which defendant's brother was a part owner. The store was on the ground level of a multi-story apartment building located on the corner of Eighth Avenue and 153rd Street, facing Eighth Avenue. It had two large plexiglas

windows in the front on either side of the front door, which also contained plexiglas panels. Another large plexiglas window was located immediately around the corner on the side of the store, facing 153rd Street, and a small sealed bathroom window, with a vent, was further down on 153rd Street. Each of the plexiglas windows and the front door were protected by pull-down metal gates each of which was secured by two padlocks. Inside the store, a counter was located some seven feet back from the front door, facing Eighth Avenue, and a plexiglas window extending from the counter to the ceiling separated the front of the store from the back. A metal door with a lock, leading to the back of the store was located at the extreme right of the counter.

There is no dispute that the fire was deliberately started with the use of gasoline in the rear area of the store behind the counter and partition. The prosecution theory was that the fire had been started by defendant just before he left to go home after finishing work at the store. The defense countered with the theory that after defendant and his co-worker, who testified on defendant's behalf, left, someone broke into the store by means of the large side window by breaking the locks, raising the gate, and pushing in the plexiglas and that the intruder set the fire and pulled down the gate behind him upon leaving.

The evidence presented by the prosecution showed that, when the firefighters arrived, they observed smoke emerging from the housing that contained the rolled down gates that covered the store windows. Using a circular saw, they cut the six locks on the three gates in the front of the store. According to Captain James Harten, when access was gained to the store, the fire immediately burst into flame, indicating that prior to that time the fire had been starved for oxygen because the store was "sealed" shut. His testimony indicated that the explosion occurred when the firefighters broke through the plexiglas windows, though there is also some testimony indicating that the windows on the door had melted. According to Chief John Francis Giblin, the explosion of flame occurred as soon as the gates went up.

Pictures taken soon after the fire show the gate on the plexiglas window that faced 153rd Street in an open position. There is no indication that any of the other firefighters, unbeknownst to those who testified, broke the locks on that gate or broke through that window. There was no apparent reason to have done so, since that window opened into the same area of the store as the front windows and, significantly,

that window had a trench or well underneath it where garbage had accumulated, arguably making it difficult to get to but, at the same time, more desirable for a person wishing to make a surreptitious entry. It was the defense's position that this was the manner in which the person who was responsible for the fire gained access, contrary to the People's theory that the fire was necessarily started prior to defendant's locking the outside gates.

The prosecution also presented the testimony of then Fire Marshall Steven Sullivan, who arrived at the scene at about 4:30 A.M., after the fire had been extinguished. In addition to his testimony indicating that the fire was deliberately set, which is not here at issue, Sullivan testified that he examined the bathroom window, which was sealed shut with no signs of a break-in, and that the only other windows were the ones in the front of the store, which were open. He specifically testified that there were no large windows on the side of the store.

The prosecution also showed that, one month before the fire, the owners of the store had purchased a $150,000 fire insurance policy. Although this policy was required by the terms under which they purchased the store, they had delayed eight months from that purchase before obtaining the policy. According to defendant's brother, the policy covered the purchase price, i.e., $80,000, of which $28,000 was still owed to the former owner, plus the cost of various improvements. Following the fire, a claim was made for the full value of the policy.

Also relied on by the prosecution was the fact that defendant normally worked during the day and had only worked at the store at night a few times before the night of the fire and the testimony of several witnesses from the neighborhood that the store customarily stayed open until 6 A.M., contradicting the testimony of defendant and his co-worker that, since the end of the summer, it had been customary to close at 3 A.M. on weekdays.

The prosecution also presented a witness who testified that the store's burglar alarm was still operational two days after the fire on the theory that, if the defendant were innocent, he would have armed the alarm and it would have gone off when the intruders broke in. However, defendant's testimony that it was not armed because it was so sensitive that it was regularly set off by mice was corroborated by the prosecution witness from the alarm company. The testimony of a woman who lived above the store that she heard a gate shut at 4 A.M., only moments before she smelled gasoline and was informed

that the building was on fire, could support either the prosecution or the defense. This was also the case with evidence that a can of gasoline was found hidden in the bottom of a trash can inside the store two weeks after the fire.

The evidence concerning ongoing hostility between store personnel, including the defendant, and neighborhood ruffians and crack dealers was offered as support for the prosecution's theory as to why the store owners wanted to rid themselves of the store, as well as by the defense as the reason why someone else would burn down the store. It should be noted that there was no indication that the store was not a lucrative investment. Moreover, while evidence was presented by the prosecution to the effect that defendant, his brother and others were, at the time of the fire, preparing to open a new store in the South Bronx, in order to support a theory that they wished to replace the troublesome Harlem store, defendant's testimony that the new store was also located in a high crime area was unrebutted.

In addition to this accumulation of circumstantial evidence of varying strength, the prosecution offered the extremely incriminating testimony of Benjamin Underwood, a resident of the building where the fire took place. Underwood testified that he was hanging out near the front of the store on the night of the fire when defendant came out of the store from under the partially open gate covering the front door. They exchanged greetings, and defendant, who seemed relaxed and not at all upset, then went inside and pulled down the gate on the door, the only one which was still unlocked. When defendant came out, alone, about 20 to 25 minutes later, he locked the remaining gate behind him. Underwood, who was still on the stoop conversing with a friend who worked as a maintenance man in the neighborhood, told defendant that he would see him later. According to Underwood, a few moments later he saw smoke emerging from behind the top of the gate and he called to defendant, using the name, "Mohammed," but defendant appeared not to hear him. Underwood then called the fire department and notified the building residents to evacuate.

It was established that at the time of the incident here in issue, Underwood had been released from prison only 6 months earlier after serving 13 years on an assault conviction, and was described by prosecution witness Larry Bodden, a local resident and the building manager, as a crack dealer, the "boss" of neighborhood youths who sold crack for him and who committed burglaries in the area and a person who knew

what went on when such burglaries occurred. Bodden also testified that he had observed store personnel trying to remove people who were selling crack in the store, resulting in arguments, and that the police were called from time to time, but no arrests were ever made. He also noted that the store was among the places in the neighborhood which were burglarized, and that he knew of a burglary in which a microwave oven had been stolen from the store.

At trial, defense counsel, in cross-examining Underwood, elicited that, in spite of his claims concerning defendant's having set the fire, he still considered defendant to be a "friend" and a "nice guy." Underwood denied that he sold crack, or that he was the "boss" of youths who sold crack or committed burglaries and he denied having had a confrontation over the microwave oven which had been stolen from the store.

While defense counsel was examining defendant's brother, a prosecution objection was sustained to a question concerning what appeared to be an unrelated assault of a store employee. Defense counsel thereupon made an offer of proof that defendant's brother Abdul would testify that the employee had been assaulted and seriously injured by Underwood's nephew, that the nephew had been arrested at the behest of himself and his employees and that Underwood had approached him and made threats if the charges were not dropped. The court, however, precluded any inquiry along this line.

Defendant persuasively argues that the preclusion of such testimony irreparably undermined the defense's attempt to demonstrate Underwood's hostility toward those who owned and worked in the restaurant and his motive to fabricate significant facts in order to implicate defendant, an employee of the restaurant and the brother of one of its owners. We agree that the court erred in precluding such testimony and that the prejudice occasioned thereby requires a reversal and a new trial.

Evidence which directly demonstrates a witness's bias, hostility, or interest in the outcome is generally admissible as relevant to the jury's consideration of that witness's credibility (People v Brown, 26 NY2d 88, 94-95; People v Torres, 51 AD2d 225, 227; Richardson, Evidence § 503 [Prince 10th ed]). In this case, the excluded evidence, if accepted as true, had direct relevance to Underwood's possible hostility against defendant by its tendency to establish that he held defendant, along with the other store personnel, responsible for the arrest of his nephew, a matter which had angered him suffi-

ciently to cause him to issue threats in an attempt to forestall the prosecution. Moreover, the evidence, if accepted by the jury as true, was also relevant in demonstrating that Underwood had an interest in implicating defendant as a way of deflecting any suspicion concerning himself which may have arisen as a result of his recent threats against the owners of the store as well as with respect to their attempts to bring other of his activities to the attention of the police.

The erroneous refusal to permit this evidence to come before the jury cannot be found to be harmless. Without Underwood's testimony the evidence against defendant, though sufficient, was far from overwhelming. The prosecution witnesses left unresolved the issue of whether, upon the arrival of the firefighters, the gate on the side window which was the focus of the defense theory was locked, or the window in place. While, according to the firefighters, the fact that the fire had burst into flame when they exposed the store to the outside air indicated that the store had previously been "sealed" their testimony was unclear and somewhat conflicting on this crucial point, since these same witnesses also testified that smoke had been seen emerging from the gates as they drove up, which would seem to indicate, to the contrary, that the store was not sealed. Moreover, the testimony was unclear as to whether the firefighters broke through the windows before the burst of flame occurred or whether it occurred as soon as the gates were opened. Nor was there any indication as to what the effect on the availability of sufficient oxygen to feed the flames would have been if the plexiglas from one window was missing but the gate in place, as claimed by the defense. Furthermore, the testimony of Fire Marshall Sullivan, the investigator, that the bathroom window was sealed shut and that there was, therefore, no way into the store other than through the gates which had been unlocked by the firefighters, must be viewed in light of the fact that he was not present when those gates were unlocked, that he had no direct knowledge of how many were unlocked by the firefighters and that, apparently, he did not even notice that there was a large plexiglas window on the side of the store. Finally, there was the unrebutted testimony of defendant's brother that during the nine months he had owned the store he had experienced two prior break-ins using precisely this mode of entry.

In the context of this ambiguous forensic evidence, the testimony of Benjamin Underwood clearly played a crucial role in the prosecution's case. It is clear that the precluded

evidence of possible bias or hostility on his part could have had a significant negative impact upon the jury's evaluation of Underwood's credibility and veracity, particularly in light of other evidence which rendered Underwood's testimony open to question. In addition to his background and his questionable activities in the immediate neighborhood, his testimony that, on the night in question, defendant had calmly spoken with him, reentered the store within full view of witnesses, then walked out and strolled down the street, still in full view, while his store caught on fire, strains credulity. Moreover, while Underwood clearly told the police that he was in the company of a friend who worked in the neighborhood at the time he had the conversation with defendant, the police, in spite of their attempts, were concededly never able to locate anyone confirming this story.

While the jury was privy to several indications that Underwood's story was suspect, they were deprived of the very evidence that would have explained to them why he had a motive to lie. In this context the court's failure to allow the defendant to explore on cross-examination this evidence of Underwood's bias and hostility deprived defendant of a fair trial. Concur—Murphy, P. J., Ellerin, Wallach and Kupferman, JJ.